# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BAUDI SPRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00889** |
| | ) | **Judge Aleta A. Trauger** |
| **THE PRUDENTIAL INSURANCE** | ) | |
| **COMPANY OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This action is governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), under which plaintiff Baudi Spry challenges defendant The Prudential Insurance Company of America's ("Prudential") denial of her claim for long-term disability ("LTD") benefits. Before the court are the parties' cross-Motions for Judgment on the Administrative Record (Doc. Nos. 34, 36), which, for the reasons set forth herein, will be denied, and the case will be remanded to Prudential for further proceedings.

## I. LEGAL STANDARDS

ERISA's purpose is to "protect beneficiaries of employee benefit plans while providing employers with uniform national standards for plan administration." *Milby v. MCMC LLC*, 844 F.3d 605, 609 (6th Cir. 2016) (citation omitted). Section 502(a)(1)(B) authorizes a person to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Judicial review of the denial of benefits challenged under this provision is *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "If the plan administrator is vested with discretion to determine eligibility under the plan, [courts] review the plan administrator's denial of benefits under the arbitrary and capricious standard." *Laake v. Benefits Comm., W. & S. Fin. Grp. Co. Flexible Benefits Plan*, 68 F.4th 984, 990 (6th Cir. 2023) (citing *Shelby Cnty. Health Care Corp. v. Majestic Star Casino, LLC*, 581 F.3d 355, 365 (6th Cir. 2009)). The parties agree that the "arbitrary and capricious" standard of review applies because the relevant plan grants discretion to its administrator, Prudential. (Doc. No. 35 at 19; Doc. No. 37 at 1.)

As the Sixth Circuit recently explained, however, courts employ a "unique" form of arbitrary and capricious review in ERISA cases, more properly referred to as "abuse of discretion." *Goodwin v. Unum Life Ins. Co. of Am.*, 137 F.4th 582, 589 (6th Cir. 2025). This is because benefits plan administrators are fiduciaries under ERISA, and the regulation of fiduciary duties sounds in trust law, which employs the abuse of discretion standard, rather than administrative law, which employs the arbitrary and capricious standard. *Id.* at 588 (first citing *Firestone Tire*, 489 U.S. at 115; and then citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008)). Even so, circuit caselaw applying "arbitrary and capricious" review under ERISA accords with what is in fact more properly denoted as "abuse of discretion" review, and therefore remains good law.[1] *Goodwin*, 137

---

[1] As Judge Thapar noted, the Sixth Circuit has "sometimes toggled between the 'arbitrariness' formulation and the 'abuse of discretion' formulation in the span of a single paragraph[.]" *Goodwin*, 137 F.4th at 589 (citing *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009)); *see also*, *e.g.*, *Gilrane v. Unum Life Ins. Co. of Am.*, No. 1:16-cv-403, 2017 WL 4018853, at *7 (E.D. Tenn. Sept. 12, 2017) ("The arbitrary-and-capricious standard, sometimes referred to as 'abuse of discretion' . . . ."). *Hatfield v. Life Ins. Co. of N. Am.*, No. 5:14-cv-432-DCR, 2015 WL 5680347, at *1 (E.D. Ky. Sept. 25, 2015) ("The abuse of discretion standard, also referred to as 'arbitrary and capricious' review, applies."); *Mitzell v. Anthem Life Ins. Co.*, No. 5:07-cv-1993, 2008 WL 11425400, at *5 (N.D. Ohio July 14, 2008) ("The 'arbitrary and capricious standard is the equivalent of an abuse of discretion standard.'" (quoting *Thompson v. Simon U.S. Holdings, Inc.*, 956 F. Supp. 1344, 1352 (N.D. Ohio 1997))).

F.4th at 589 ("[O]ur circuit's ERISA arbitrariness review doesn't buck the Supreme Court's abuse of discretion framework."). This court will use the "abuse of discretion" standard.[2] *Accord id.* ("[B]ecause labels affect thought, it's best to follow the Supreme Court's lead and call our standard of review what it is: abuse of discretion.").

Under abuse of discretion review, the court must uphold the plan administrator's decision if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 547 (6th Cir. 2020) (quoting *Jackson v. Blue Cross Blue Shield of Mich. Long Term Disability Program*, 761 F. App'x 539, 543 (6th Cir. 2019)). The administrator's decision is not an abuse of discretion if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Rothe v. Duke Energy Long Term Disability Plan*, 688 F. App'x 316, 319 (6th Cir. 2017) (quoting *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006)). As the Sixth Circuit has instructed, courts "do not ask whether the plan's decision was the most reasonable decision, or whether it was more reasonable to deny benefits than to grant them[.]" *Holden v. Unum Life Ins. Co. of Am.*, No. 20-6318, 2021 WL 2836624, at *11 (6th Cir. July 8, 2021) (quoting *Davis By & Through Farmers Bank & Cap. Tr. Co. v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). That is, the decision only need be procedurally and substantively reasonable. *Goodwin*, 137 F.4th at 589 (citing *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022)).

---

[2] *But cf. Engweiler v. Howmet Aerospace Inc.*, No. 1:24-cv-975, 2025 WL 2318464, at *6 n.6 (W.D. Mich. Aug. 12, 2025) (stating, in the only other opinion to cite *Goodwin*, that "it is not entirely clear whether *Goodwin* also renames the review conducted by district courts," and therefore continuing to use our circuit's "older terminology" in its discussion).)

3

At the same time, however, the abuse of discretion standard "does not require [courts] merely to rubber stamp the administrator's decision." *Jordan v. Reliance Standard Life Ins. Co.*, No. 22-5234, 2023 WL 5322417, at *6 (6th Cir. Aug. 18, 2023) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). It is Spry's burden to show that Prudential acted unreasonably by denying her claim. *Avery v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 22-1960, 2023 WL 4703865, at *8 (6th Cir. July 24, 2023) (citing *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011)), *cert. denied*, 144 S. Ct. 806 (2024).

## II.   PROCEDURAL HISTORY

Spry asks this court to find that she is disabled and entitled to benefits under her policy, to award damages for unpaid disability benefits, and to order the defendant to pay benefits so long as she is disabled. (Complaint, Doc. No. 1 at 7, ¶¶ 37–45.) The defendant has filed an Answer with Affirmative Defenses (Doc. No. 8). Now before the court are the parties' cross-Motions for Judgment on the Administrative Record.[3] Prudential has filed an almost three-thousand page Administrative Record ("A.R.") (Doc. Nos. 33-1 through 33-13)[4] and Declarations attesting to its authenticity (Doc. Nos. 33-14 through 33-16). The plaintiff has filed a Motion for Judgment on

---

[3] In a recent a published opinion, the Sixth Circuit questioned the propriety of motions for judgment on the administrative record. *Goodwin*, 137 F.4th at 588 n.1 ("One searches the Federal Rules of Civil Procedure in vain for 'motions for judgment on the administrative record.'"). And, the court added, litigants "cannot move for 'judgment on the administrative record.'" *Id.* However, the court put this issue to the side and affirmed the district court's order granting the defendant's motion for judgment on the administrative record. *Id.* at 588, 592. Without instruction to the contrary, the court will rule on the pending motions without further comment.

[4] The court will cite the Administrative Record by a simplified version of its pagination, indicated by the Bates stamp at the bottom right corner of each page, rather than that assigned by the court's electronic filing system. For example, the court would cite the first page of the Administrative Record, PRU 077212-003454-00*0001* (Doc. No. 33-1 at 1), as "A.R. at 0001," and the last page of the Administrative Record, PRU 077212-003454-00*2901* (Doc. No. 33-13 at 2), as "A.R. at 2901."

4

ERISA Record (Doc. No. 34) with an accompanying Memorandum (Doc. No. 35) and an exhibit (Doc. No. 35-1), to which the defendant has filed a Response (Doc. No. 38), and in further support of which the plaintiff has filed a Reply (Doc. No. 40). Meanwhile, the defendant has filed its own Motion for Judgment on the Administrative Record (Doc. No. 36) and a Memorandum in support (Doc. No. 37), to which the plaintiff has filed a Response (Doc. No. 39), and in further support of which the defendant has filed a Reply (Doc. No. 41).

## III.    FACTS

### A.    Background

Until January 2020, Spry worked for Community Health Systems ("CHS"), most recently as Senior Director of Information Technology, Internal Audit and Compliance, (Answer ¶ 8; A.R. at 1256), a highly skilled desk job that involved managing staff and performing internal audits related to cybersecurity. (A.R. at 1257.) During her employment with CHS, Spry participated in its Welfare Benefit Plan (the "Plan"), which is governed by ERISA. (Answer ¶¶ 9, 11.) Prudential issued a Group Contract to CHS (A.R. at 2791–820), under which Prudential both insured the Plan's LTD benefits and served as claims administrator for them, in which capacity it had discretion to determine participants' eligibility for benefits. (Answer ¶¶ 10, 32; Doc. No. 37 at 2; A.R. at 2865 (designating Prudential as claims administrator and stating that "Prudential . . . has the sole discretion to interpret the terms of the plan, to make factual findings, and to determine eligibility for benefits.").) Among the Plan's constituent documents is the Class 1 Booklet 201 (A.R. at 2821–71), which provides information regarding Spry's LTD benefits.[5]

---

[5] The plaintiff states that the Administrative Record includes the incorrect LTD policy, at A.R. at 161–210 (Class 7 – Booklet 204), and has filed what she states is the correct policy, "Class 1 – Booklet 201" (Doc. No. 35-1). (Doc. No. 35 at 3 n.6.) However, Prudential *has* included Class 1 – Booklet 201 in the Administrative Record, (A.R. at 2821–71), cites it for the operative definition of "disabled" (Doc. No. 37 at 13 (quoting A.R. at 2835)), and states that this booklet

5

Under the Plan's Long Term Disability Coverage, a participant is disabled, when, as addressed to the participant: "[d]ue to sickness or injury, you are unable to perform the material and substantial duties of your regular occupation." (A.R. at 2835 (emphasis removed).) "Material and substantial duties . . . are normally required for the performance of your regular occupation[] and cannot be reasonably omitted or modified[.]" (*Id.* (emphasis removed).) "Regular occupation means the occupation you are routinely performing when your disability begins." (*Id.* (emphasis removed).)

Spry left CHS on January 27, 2020. (Answer ¶ 12.) That May, Spry filed an application for LTD benefits under the Plan. (*Id.* ¶ 14.) As the court will discuss, Prudential denied Spry's application and two appeals. Spry supported her application and appeals with the opinions of her two treating physicians, a vocational therapist, and voluminous medical records. To assess Spry's claim, Prudential relied on the recommendations of vocational specialists and independent reviewing physicians who worked for third-party companies with whom Prudential contracted.[6]

Spry has a complicated medical history with many symptoms. Her medical chart from a June 3, 2020 appointment, roughly two weeks after she submitted her application for LTD, for example, lists sixty-five "active problems." (A.R. at 1484–85.) Most relevant here, in 2019 Spry

---

sets forth the relevant LTD benefits. (Doc. No. 37 at 3–4.) Thus, the parties agree on the operative policy.

[6] Prudential states that all four reviewing physicians "were hired by a third-party vendor, without any direct contact or payment from Prudential." (Doc. No. 38 at 12 n.6.) The record suggests that one reviewing physician, Dr. Sims, worked for a company called "MES Peer Review Services," while the other three worked for "ECN." (*Contrast* A.R. at 1217, Dr. Sims Report (report is on MES letterhead), *with id.* at 1225, Dr. Massachi Report ("I have been asked to review the medical records on behalf of ECN."), *and id.* at 2173, Dr. Chou Report I (same), *and id.* at 2562, Dr. Chou Report II (same), *and id.* at 2574, Dr. Ashlock Report (same). *See also id.* at 2485–86 (letter from Prudential to ECN).) In any case, Spry does not contest Prudential's claim that it did not directly employ, pay, or contact the physicians who reviewed her file, and nothing in the Administrative Record to which the parties have directed the court suggests otherwise.

began suffering from a range of symptoms that yielded a diagnosis of postural orthostatic tachycardia syndrome ("POTS").[7] (*Id.* at 1357, Dr. Allie Statement[8] at 3:11–20.) Prudential concedes that Spry suffers from POTS. (Doc. No. 38 at 10 n.5.) Among "multiple symptoms attributed to POTS," Spry's "primary" symptoms are "chest pressure and episodic [heart] palpitations that are exacerbated by activity." (A.R. at 2094.) Spry's treating physician, Dr. Adam Allie, described Spry this way: "she's . . . no longer the fit person that I met, but is virtually debilitated to this point. So it's a very sad, very frustrating case." (*Id.* 1357–58, Dr. Allie Statement at 3:23–4:1.)

## B. Claims Process

The court focuses on Prudential's "'ultimate decision,' rather than 'discrete acts,'" in the claims process. *Harmon v. Unum Life Ins. Co. of Am.*, No. 23-5619, 2024 WL 1075068, at *2 (6th Cir. Mar. 12, 2024) (quoting *McClain*, 740 F.3d at 1066). However, discussing Prudential's claims process, including its denials of Spry's initial claim and two appeals, is part of the court's thorough review of the record. *Accord Sandeen v. Unum Grp. Corp.*, No. 22-5374, 2023 WL 2379012, at *1 (6th Cir. Mar. 7, 2023).

---

[7] "Postural orthostatic tachycardia syndrome (POTS) is a condition that causes a number of symptoms when you transition from lying down to standing up, such as a fast heart rate, dizziness and fatigue. While there's no cure, several treatments and lifestyle changes can help manage the symptoms of POTS." Postural Orthostatic Tachycardia Syndrome, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots [https://perma.cc/39E2-C3HH] (last visited Dec. 9, 2025).

[8] Spry submitted, with her First Appeal, the June 8, 2021 "Telephonic Sworn Statement" of her treating physician, Dr. Adam Allie, taken by plaintiff's counsel at their office, before Lori Robertson, notary public and licensed court reporter. (A.R. at 1355.) Although the plaintiff refers to the document as a "Statement," it is in question-and-answer format.

7

1. *LTD Application*

Spry filed a claim for LTD benefits under the Plan on May 21, 2020, providing as the medical reason for the claim, "orthostatic intolerance POTS and tachycardia syndrome." (A.R. at 0015.) In support of her application, in addition to numerous medical records, Spry submitted a June 5, 2020 Attending Physician Statement by her primary care physician, Dr. Adam Allie, who stated that Spry had been diagnosed with, as "pertinent" to her application, POTS, anxiety, and fibromyalgia, and that she had been "unable to work in any capacity since January, 2020 . . . due to severe and relentless fatigue, muscle pain and weakness, unmanaged rapid heart rate and tachycardia with and without exertion, shortness of breath, nausea, night sweats, heat intolerance, anxiety-like symptoms, dizziness and lightheadedness, poor tolerance to stress, blurry vision and sometimes double vision, headaches including migraines, tremulousness throughout [her] body, palpitations, daytime sleepiness, inability to concentrate and focus, non-refreshing/restorative sleep, post-exertional fatigue, and medication side-effects." (*Id.* at 0123.) Dr. Allie reported that testing at the Mayo Clinic's Jacksonville Neurophysiology Lab "showed abnormal laboratory findings which clearly indicate autonomic dysfunction." (*Id.* at 0124.)

Further, Dr. Allie described at some length why particular categories of symptoms kept Spry from working. (*Id.* at 0124–25.) For example, tachycardia (increased heart rate) and shortness of breath, among other symptoms, imposed a "[m]arked limitation in ability to move from a sitting to standing position[,] . . . to crouch, stoop, kneel, bend or climb stairs[.]" (*Id.* at 0124.) "[C]ognitive dysfunction with brain fog" rendered her unable to "articulate complex thoughts and express those thoughts verbally or in required writing." (*Id.*) "[S]evere mental and physical fatigue" and "poor endurance" made her unable to "maintain regular attendance/schedule" or to meet deadlines, and required her to take "multiple unplanned breaks in a reclined or supine position." (*Id.*) Weakness and muscle pain presented similar obstacles to work. (*Id.*) Irritability,

8

anxiety, and "depression-like symptoms," among others, created "[d]ifficulty coping and handling stress; challenges with positively engaging professionally with coworkers and clients; poor time management," and several other traits desirous of an office worker. (*Id.* at 0124–25.) Insomnia and "unrefreshed" and "delayed" sleep caused lack of endurance, motivation, and follow-through. (*Id.* at 0125.) Dr. Allie concluded that he expected Spry's condition to persist throughout her life, "at best" to be "slightly improved with symptom management," and that she would remain unable to work in her previous job or any "reasonable occupation." (*Id.*)

### 2. First Denial

Prudential sent Spry's file to independent medical reviewer Dr. Mark Sims, board certified in internal medicine with a subspecialty in cardiovascular disease, who reviewed Spry's claim and issued a ten page report, which includes a list of the more than one hundred documents he reviewed (*id.* at 1217–20), a summary of Spry's medical records (*id.* at 1220–24), an eight sentence "Summary of Opinion"[9] (*id.* at 1220), and his responses to Prudential's questions (*id.* at 1124–26).[10]

Dr. Sims' summary indicated that Spry has "mild orthostatic hypotension" insufficiently "severe to cause frank syncope."[11] (*Id.* at 1220.) He noted that Spry does not have structural heart

---

[9] While the Report includes a "Summary of Opinion," there is no longer, written opinion it summarizes.

[10] The Report also includes a "Conflict of Interest Attestation," in which Dr. Sims disclaims any conflict of interest. (A.R. at 1226 ("I certify that I do not accept compensation for review activities that is dependent in any way on the specific outcome of the case.").) Each subsequent file-reviewing physician signed a similar attestation. (*Id.* at 2180 (Dr. Massachi); *id.* at 2181, 2570 (Dr. Chou); *id.* at 2597 (Dr. Ashlock)).

[11] Prudential defines "frank syncope" to mean "fainting spells." (Doc. No. 37 at 4.) Drs. Mobarek and Allie, respectively, describe Spry as suffering from both syncope and "presyncope," but not "frank" syncope. (A.R. at 1367 ("[p]atient with daily chronic tachycardia causing syncope"); A.R. at 0124 (noting "symptoms of presyncope")). According to the Cleveland Clinic, "[s]yncope is the broad medical term for fainting or passing out." Cleveland Clinic, *Syncope (Fainting)*, https://my.clevelandclinic.org/health/diseases/17536-syncope

9

disease or coronary artery disease, except for "mild LAD myocardial bridging," and noted that she does not have "significant valvular heart disease" or "hemodynamically significant arrhythmias." (*Id.*) Based on the foregoing, Dr. Sims stated that Spry "can perform full-time work" with slight accommodations for her "mild orthostatic hypotension," including "sitting or lying [down] should she become symptomatically orthostatic." (*Id.* at 1220, 1224.) He noted that Spry may gain "additional functional capacity" if medication and recommended exercise improved her conditions. (*Id.* at 1220.) Dr. Sims answered questions the form posed. One such question was the following:

> Spry's physician, Adam Allie indicates the claimant is unable to work in any capacity due to fatigue, muscle pain, weakness, rapid heart rate, tachycardia, shortness of breath, nausea, heat intolerance, anxiety, dizziness, poor stress tolerance[,] inability to concentrating [sic] and medication side effects. Are these limitations/restrictions medically necessary? Please provide a *detailed* explanation and *point to the specific documentation* in support of your opinion. If you opine the limitations/restrictions are not medically necessary, please provide a *detailed explanation* of why your opinion differs from Dr. Allie.

(*Id.* at 1225 (emphasis added).) Dr. Sims responded, in full:

> I have assessed the claimant from [a] strictly cardiovascular standpoint and as such

---

[https://perma.cc/54VC-PHR6] (last visited Dec. 9, 2025). Under Social Security Administration regulation, "'Syncope' is defined as 'a loss of consciousness or a faint,' while 'near syncope' is defined as 'a period of altered consciousness.'" *Robertson v. Comm'r of Soc. Sec.*, 513 F. App'x 439, 440–41 (6th Cir. 2013) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1 § 400.F(3)(b)). Spry does not make clear that, by "syncope," she means fainting, as opposed to merely symptoms that customarily precede fainting. And Spry does not state, in any filing, that she experiences loss of consciousness. Other courts have distinguished syncope from frank syncope and appear to construe syncope more broadly than fainting. *See, e.g.*, *Deacon v. Kijakazi*, No. 1:21-cv-00641-BAM, 2022 WL 17363228, at *12 (E.D. Cal. Dec. 1, 2022) (describing a POTS patient's record as including "limited reports of syncope, but no frank syncope"); *Jenkins v. Saul*, No. 1:20-cv-2544-SVH, 2021 WL 248704, at *16 (D.S.C. Jan. 26, 2021) (describing a patient's "dizziness, but no frank syncope"). The court therefore infers that the plaintiff uses "syncope" broadly, and that the record does not reflect that Spry suffers from fainting spells, but rather the sensations that often precede them.

opin[e] that the R/L's [restrictions/limitations] listed in the answer to question #2 would be applicable. She has no evidence of significant structural heart disease that would cause fatigue, muscle pain, weakness, shortness of breath, nausea, heat intolerance anxiety, impaired concentration (as her orthostasis is mild), therefore I would defer assessment of these symptoms to a physician of the appropriate specialty. In addition she has no documentation of significant arrhythmias and has not been found to have a life threatening cardiovascular anomaly. Based on review of the totality of provided medical records.

(*Id.*) Dr. Sims' answer does not provide detailed explanations citing the record. Prudential did not then require Spry to undergo testing by a physician of the appropriate specialty, nor did it, at that point, send her file to another physician for review. It is not clear why Dr. Sims disagreed with Dr. Allie, other than that "significant structural heart disease" did not cause Spry's symptoms. He did not explain why he disagreed with Spry's treating physicians' assessment that Spry's symptoms would prevent her from working. Dr. Sims reported that he left three voicemails for Dr. Allie on each of the three days before he filed his Report, but that Dr. Allie did not return his calls. (*Id.* at 1220.)[12] Prudential also had Vocational Specialist Steven Lambert evaluate Spry's claim. He found that Spry could continue working. (*Id.* at 1256–59.) Prudential denied Spry's claim, it said, because, based upon the opinion of Dr. Sims and a review of its vocational department, her "medical condition would not prevent [Spry] from performing [her] regular occupation." (*Id.* at 1263–64.)

---

[12] Prudential states that "Dr. Sims had been given 9 business days to provide a medical review report," (Doc. No. 37 at 17 n.7), but neither explains why this was so, nor why Dr. Sims received Spry's file on October 1 (A.R. 1217), when Spry had submitted her benefits application the previous May. While Dr. Sims' attempt to discuss Spry's case with Dr. Allie shows a good faith effort on his part, and on Prudential's, the compressed timeline may not have accounted for a doctor's busy schedule or the possibility of vacation or illness. The record does not show that any other reviewing physician, or Prudential, attempted to speak with any of Spry's doctors.

11

### 3. First Appeal

In November 2021, Spry filed an appeal ("First Appeal") (*id.* at 1340–48) along with Medical Opinion Forms from two of her doctors, Dr. Allie (*id.* at 1350–53, dated June 8, 2021), and Dr. Sameh Mobarek (*id.* at 1367–70, dated Nov. 9, 2021), along with Dr. Allie's June 8, 2021 Telephonic Sworn Statement (*id.* at 1355–1365), a vocational assessment by Wallace Stanfill, Certified Rehabilitation Counselor (*id.* at 1372–1379), and additional medical records (*id.* at 1414–2138).[13]

According to Dr. Allie, Spry suffers from POTS, depression, fibromyalgia, dysautonomia, deep vein thrombosis, premature ventricular contractions of the heart, irritable bowel syndrome, extreme exhaustion, malaise, joint pain and stiffness, and brain fog. (*Id.* at 1350; *id.* at 1358, Dr. Allie Statement at 4:5–8).[14] The Medical Opinion Forms include various templates for the reviewing physician to fill in with short phrases, numbers, or checkmarks. Dr. Allie indicated that Spry can sit for 3–4 hours per 8-hour workday, for 15–20 minutes at a time, and that she can stand or walk for 1 hour per day, for 20 minutes at a time. (*Id.* at 1350.) He noted that she is never able to lift more than 10 pounds, needs to lie down every 30 minutes, and would require a 20-minute break for every 1 hour of work. (*Id.* at 1350–51.)[15] Dr. Allie indicated with checkmarks that Spry

---

[13] Spry's medical records submitted with her First Appeal both pre- and post-date her Application. As the Sixth Circuit has stated, "administrators are not rigidly locked into their initial benefits decision, especially when new medical evidence comes to light or the participant's health changes." *Autran*, 27 F.4th at 414 (citations omitted) (finding that the administrator's decision to switch the plaintiff from total to partial disability, based on new medical evidence, was not arbitrary and capricious).

[14] Spry has also been diagnosed with manic depressive disorder. (A.R. at 1358, Dr. Allie Statement at 4:2–5.)

[15] Dr. Allie further stated that, "[s]ince prolonged sitting without multiple breaks would result in rendering her pain and symptom exacerbation [sic], she really should not be sitting more than 30 to 45 minutes at a time." (*Id.* at 1360, Dr. Allie Statement at 6:10–16.)

12

was "reasonably suffer[ing]" from "severe" pain that would interfere with her working full time, that her "subjective complaints seem[ed] reasonable in view of [his] observations and diagnoses," and that she would be able to type or write for less than one third of the day. (*Id.* at 1351.) He recorded "poor" for her abilities of: "concentration[,] persistence[,] and pace;" to adapt to stressful work circumstances; deal with the public; deal with work stress; "demonstrate reliability;" to persist at assigned tasks; and to "work at a consistent pace for acceptable periods of time." (*Id.* at 1352–53.) Dr. Allie recounted the difficulty Spry would have at her job because of her physical and cognitive symptoms, concluding that, based on his treatment and opinion, she would not be able to work a full-time job. (*See generally* Dr. Allie Statement.) As Dr. Allie described Spry's condition:

> [Spry's] symptoms . . . have reached a point to where currently, if she exerts herself even in the slightest of task, for instance walking out to her garage . . . she is thus rendered with extreme exhaustion, extreme fatigue, malaise, tachycardia, hypertension, headache, paresthesias. . . . . After, I believe, walking even 20 minutes, she could have severe joint pain and stiffness. She's also developed cognitive deficits, such as brain fog, decreased concentration. She's really unable to focus.

(*Id.* at 1359, Dr. Allie Statement at 5:12–22.)[16] Dr. Allie stated that Spry needs breaks of "ideally" 10–15 minutes three times per hour, and that, while working, she would be off-task because of her cognitive symptoms and unable to perform complex work or supervise others. (*Id.* at 1361–63, Dr. Allie Statement at 7:5–9:12.) Dr. Allie stated that, "as her condition has deteriorated, she has sustained and continues to sustain a great degree of brain fog, decreased concentration, inability

---

[16] Neither the record nor the parties define "paresthesia." The Sixth Circuit has alternately defined it as tingling and numbness. *See Creech v. UNUM Life Ins. Co. of N. Am.*, 162 F. App'x 445, 454 (6th Cir. 2006) (tingling); *Chesnut v. United States*, No. 23-5547, 2024 WL 5103668, at *2 (6th Cir. Dec. 13, 2024) (numbness). In any case, Spry suffers from both.

13

to focus, inability to complete tasks, virtually, completely unable to multitask." (*Id.* at 1363, 9:17–21.)

Dr. Mobarek, another of Spry's treating physicians, submitted a form indicating that Spry suffers from "[d]ysautonomia secondary to [POTS]," as well as "daily chronic tachycardia causing syncope, dyspnea, palpitations, confusion, lightheaded[ness], dizz[iness], severe fatigue, exercise intolerance, heat intolerance, brain fog, nausea, diarrhea, constipation and abdominal cramping," and "[c]onstant moderate to severe generalized pain." (*Id.* at 1367.)[17] He noted similar restrictions as Dr. Allie, although he indicated that Spry would only be able to sit for 1–2 hours per workday and "only a few days in a row <u>not</u> 5 days," that she would have to lie down for six hours every day and take "very [f]requent breaks of at least 30 minutes." (*Id.* at 1367–68 (emphasis in original).) He predicted that Spry would be absent from work for medical reasons roughly 8–10 days per month, which is more than Dr. Allie's predicted 4–8 days per month. (*Contrast id.* at 1369, *with id.* at 1352.)

### 4. Second Denial

To aid in Prudential's determination of Spry's First Appeal, two additional independent reviewing physicians examined Spry's file, each issuing a report: Dr. Sasan Massachi, board certified in internal medicine (*id.* at 2164–72) and Dr. Stanley Chou, board certified in internal medicine with a subspeciality in cardiovascular disease (*id.* at 2173–79). Prudential also had Vocational Specialist Lambert conduct a second review. (*Id.* at 2204–10.) Both doctors reviewed and summarized Spry's medical history and both reviewed the Medical Opinion Forms submitted

---

[17] According to the Cleveland Clinic, dyspea means "shortness of breath." Dyspnea, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/symptoms/16942-dyspnea [https://perma.cc/ZND3-WACW] (last visited Dec. 8, 2025). Shortness of breath is listed among Spry's symptoms elsewhere in the record. (A.R. at 0769.)

14

by Drs. Allie and Mobarek.[18] (*Id.* at 2164–68, 2173–75.) The doctors characterized their summary of Spry's diagnoses differently, but both included, at a minimum, POTS. (*Contrast id.* at 2168, Dr. Massachi Report ("Diagnoses: History of pelvic vein thrombosis [status/post] hysterectomy, dysautonomia secondary to postural tachycardia syndrome [POTS], fibromyalgia, facial numbness, occipital neuralgia, and lower extremity paresthesia."), *with id.* at 2175, Dr. Chou Report I (reporting only POTS under "Diagnoses").)

Dr. Massachi noted that, in May 2021, Spry "was again discussed [sic] on lifestyle modification in order to control her POTS." (*Id.* at 2167.) Dr. Massachi noted both improvement and setbacks. At a June 2021 appointment he discussed, Spry had "improvement in heart rate" with medication, a decrease in severity of heart palpitations, and a "fe[eling] like she was able to do more activities and stand up for longer periods," and "[o]verall . . . significant improvement," although on some, "bad days," Spry was "unable to do any activity because of severe dizziness and coat h[a]nger headaches."[19] (*Id.*) In support of his finding that Spry was not functionally limited, Dr. Massachi summarized Spry's condition as follows:

> Based on the information provided, the claimant was diagnosed with postural orthostatic tachycardia syndrome with symptoms of palpitations, headaches, dizziness and excessive sweating. She was encouraged liberal fluid but later on prescribed propranolol with noted improvement in symptoms. In addition, she

---

[18] Spry states that, in his review of her file, Dr. Massachi did not mention Dr. Mobarek's Medical Opinion Form. (Doc. No. 35 at 12.) While it is true that Dr. Massachi's Report does not *name* Dr. Mobarek's Report, the court credits the defendant's explanation that the Report's mistaken reference to a nonexistent, second November 9, 2021 Report by Dr. Allie is meant to refer to the November 9, 2021 Report by Dr. Mobarek. (*Accord* Doc. No. 38 at 13 n.7.) Not only do the dates match, but also the recommendations Dr. Massachi summarized. (*Compare* A.R. at 2168, *with id.* at 1194, 1196.)

[19] The parties do not define "coat hanger headache." One court has noted the testimony of Dr. Kenneth Mack, then-chair of child and adolescent neurology at the Mayo Clinic, according to whom "POTS patients most frequently report . . . 'coat hanger' headache[s], emanating bilaterally from the neck and shoulders." *Johnson v. Sec'y of Health & Hum. Servs.*, No. 14-254V, 2018 WL 2051760, at *16 (Fed. Cl. Mar. 23, 2018). Spry has reported experiencing coat hanger headaches "before, during, and/or after episodes" of tachycardia and hypertension. (A.R. at 2072.)

15

reported facial numbness and occipital neuralgia which improved on medications. She was also prescribed Lyrica and Cymbalta for her lower extremity paresthesias with noted improvement. However, she did not seek further care with neurology for this. With regards to her POTS, she is recommended lifestyle modification with aerobic exercises and staying more active to improve her symptoms. Therefore, the claimant requires no restrictions and [sic] limitations.

(*Id.* at 2169.) As with Dr. Sims' report, The Massachi Report asked the reviewing physician to respond to Dr. Allie's opinion of Spry's impairments, as presented in his Medical Opinion Form and Sworn Statement. (*Id.* at 2170 (requesting that he "provide a detailed explanation and point to the specific documentation" that supports his opinion, and to "provide a detailed explanation of why your opinion differs from Dr. Allie's").) Dr. Massachi provided a two-sentence summary of Dr. Allie's recommended restrictions, as provided on his June 2021 Opinion Form. (*Id.*) The remainder of his response, in full, states:

No, the nature/level of impairment endorsed by Dr. Allie is not reasonably consistent with and/or supported by the medical documentation in file. I do agree that the claimant had elevated blood pressure and tachycardia with associated headaches, lightheadedness, and sweating. However, she was reassured that these were not life threatening. In addition, she was recommended doing aerobic exercises to improve her symptoms. Therefore, I respectfully disagree that she requires any restrictions or limitations.

(*Id.*) This statement neither offers a detailed explanation nor cites the record.

While Dr. Massachi found that "no functional impairment [was] supported, . . . based on any one or a combination of symptoms/conditions within the scope my expertise," Dr. Chou found that Spry was functionally limited due to POTS and therefore recommended that she be limited to standing or walking to two hours per day, with no restrictions for sitting or "fine manipulation." (*Id.* at 2168, 2176–77.) Dr. Chou noted that, during a March 7, 2021 appointment with Dr. Mobarek, Spry reported "lightheadedness upon standing, photosensitivity; sound sensitivity; palpitations; chest pain; severe fatigue; exercise intolerance; heat intolerance, excessive sweating, muscle twitches, tremors, brain fog, hoarseness of voice; ringing in the ears; and polydipsia[.]"

16

(*Id.* at 2176.) Summarizing records from her late Spring 2021 appointments, Dr. Chou stated that "[Spry] has multiple symptoms attributed to POTS but her primary symptoms are chest pressure and episodic palpitations that are exacerbated by activity." (*Id.*) Asked to respond to the restrictions suggested by Dr. Allie in June 2021 and Dr. Mobarek in November 2021, Dr. Chou wrote, in full, in response to both: "I respectfully disagree with the outlined restrictions, except for the lifting restriction, as there are no measurable findings to support such restrictions for the claimant." (*Id.* at 2178.)

Prudential had Vocational Specialist Steve Lambert conduct a second review, in which he agreed with the restrictions Dr. Chou suggested. (*Id.* at 2209.) As part of his second review, Lambert summarized and disagreed with the conclusion by Spry's rehabilitation counselor, Wallace Stanfill, who had found that "[b]oth the physical and cognitive symptoms described by Dr. Allie prevent any employment, let alone the cognitively demanding and complex duties of Ms. Spry's job[.]" (*Id.* at 1379.)

By an April 2022 letter ("First Appeal Denial Letter") (*id.* at 2248–64), Prudential upheld its decision denying Spry LTD benefits. In relevant part, the First Appeal Denial Letter describes Dr. Mobarek's and Dr. Allie's reviews and summarizes Prudential's reviewing physicians' responses to Spry's treating physicians as follows: "the level of impairment opined by Dr. Mobarek[] and Dr. Allie are not supported by the information in [the] file and citing [sic] a lack of measurable findings that would support such strict restrictions." (*Id.* at 2251.) The Letter indicates that, according to reviewing physician Dr. Massachi, Spry had improved with medication, "was encouraged liberal fluids," did not follow up with a neurologist as recommended, and "was recommended lifestyle modifications with aerobic exercises and staying [sic] more active to improve her symptoms." (*Id.*) The Letter refers to reviewing physician Dr. Chou's conclusion that

17

slight accommodations were required, and notes that Dr. Chou identified Spry's primary POTS symptoms as "chest pressure and episodic palpitations that are exacerbated by activity." (*Id.*) The Letter states that the reviewing physicians "did not find the level of impairment indicated by Ms. Spry's treating providers to be supported by the information on file, including the results of diagnostic and laboratory testing, findings on physical examinations and clinical observations documented in treatment notes." (*Id.* at 2252.) Further, the Letter notes that Spry's treating physicians "opine [that] Ms. Spry suffers cognitive impairment," but, Prudential writes, her file does not contain "neuropsychological testing to support" it. (*Id.*) Similarly, while Spry's doctors "report that she suffers from anxiety and depression . . . there is no indication that she is treating with a mental health specialist and thus, no indication of how these conditions may impact her functional capacity." (*Id.*)

5.    *Second Appeal*

In February 2023, Spry filed another appeal with additional medical records, and she sent further medical records in March 2023. (*Id.* at 2313–464, 2504–53).[20] Spry also requested that, if Prudential intended to deny the appeal, as required by 29 C.F.R. 2560.503-1(h)(4), it give her the evidence upon which it was planning to base its rejection, so that she could reply before Prudential issued its final decision. (*Id.* at 2314.) Prudential complied with Spry's request. (Doc. No. 35 at 5 (acknowledging that Prudential sent Spry its physicians' file reviews, to which she responded, and Prudential sent "additional evidence," to which Spry responded, before Prudential issued its final denial).)

---

[20] The Second Appeal Letter does not include any argument. (A.R. at 2314 (stating the request for granting Spry LTD, noting the additional records, and stating that the new evidence, "together with all the other evidence already on file, establishes her continuing entitlement to benefits").)

18

### 6. Third Denial

To review Spry's second appeal, Prudential again sent her file to Dr. Chou and also sent the file to Dr. Benton Ashlock, board-certified in internal, critical care, and pulmonary medicine. Both issued reports. (*Id.* at 2562–70 (Dr. Chou), 2574–94 (Dr. Ashlock).) In addition, Prudential sent Spry's file to vocational specialist Karin Gibson, who issued a report (*id.* at 2605–06), and, after Spry objected to Gibson's analysis, for further review to vocational specialist Thomas Van Tassel, who issued a report (*id.* at 2674–80).

Dr. Chou reaffirmed his earlier conclusions. He recounted Spry's many symptoms from POTS but noted that "her primary symptoms are chest pressure and episodic palpitations that are exacerbated by activities." (*Id.* at 2567.)[21] Dr. Chou noted that, based on a February 2022 report by Dr. Mobarek, Spry "has been doing poorly from the cardiac standpoint. She remains with recurrent episodes of dizziness, lightheadedness, nausea, racing palpitations, dyspnea, chest burning, fatigue, poor memory, and brain fog." (*Id.*) He again found that Spry was functionally limited due to POTS and again recommended minor restrictions. (*Id.* at 2567–68.) He again disagreed with the restrictions suggested by Spry's doctors, except for the restriction on lifting, noting only that "there are no measurable findings to support such strict restrictions for the claimant." (*Id.* at 2569.)

Dr. Ashlock reviewed voluminous medical records and the opinions of Spry's doctors, recounted Spry's medical history from January 2019 through February 2023 (*id.* at 2574–88), and summarized Spry's medical history as follows: "significant for pelvic vein thrombosis . . .

---

[21] Spry appears to agree with this characterization of her condition. (Doc. No. 35 at 7 ("Ms. Spry's treating physician, Dr. Shibao, confirmed her POTS diagnosis and noted that her 'primary symptoms are chest pressure and episodic palpitations that are exacerbated by activity.'" (quoting A.R. at 2094)).)

19

dysautonomia secondary to postural orthostatic tachycardia syndrome, paresthesia, fibromyalgia, and depression." (*Id.* at 2576.) Asked by the form whether, and if so why, Spry had a "functional impairment," Dr. Ashlock summarized her conditions, the results of testing, recited some of her medical history, and noted that her symptoms due to POTS "include tachycardia/palpitations, perspiration, paleness, tremors, headaches, chest tightness, dizziness, malaise/fatigue, orthostasis, weakness, dysphagia, abdominal discomfort, and brain fog."[22] (*Id.* at 2588–89.)[23] He summarized other symptoms: "paresthesia in her hands and pulsations in her legs and gum area," intermittent pain and stiffness in her feet, tingling in her face and tongue, face and throat numbness accompanied by throat-tightness, lip-twitching, "a sensation like something is wrapping around her right eye and pulling it back into her head," a "feel[ing] like she's being choked and like there is pressure/burning in her chest, preventing her from breathing properly," chronic fatigue, brain fog, daily headaches, occasional nausea and photophobia, intermittent dysphagia, and "periodic numbness and tingling and the feeling of ants crawling on her lower legs and feet." (*Id.* at 2589.)

According to Dr. Ashlock, Spry "is mainly impaired" by POTS, which causes "fatigue, SOB/breathlessness, weakness, tachycardia/palpitations, chest tightness, profuse sweating, dizziness, lightheadedness, tremors, gastrointestinal symptoms (abdominal discomfort), headaches, vision problems, [and] numbness/tingling sensations that occur during episodes." (*Id.* at 2590.) Dr. Ashlock concluded that, while "most diagnostic tests and objective findings were normal, [Spry] continued to have subjective symptoms which are variable and unpredictable in

_____

[22] Dysphagia means difficulty swallowing. *See* Dysphagia, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/symptoms/21195-dysphagia-difficulty-swallowing [https://perma.cc/EVT4-AP6X] (last visited Dec. 11, 2025).

[23] Dr. Ashlock "defer[ed] mental health conditions to another reviewer," but noted that, "since there is a confirmed tilt-table result, one cannot rule out presence of POTS and unpredictable episodes associated with it." (A.R. at 2592.)

20

nature; thus, [Spry] requires precautions as she remains at significant risk of injury," to include only moderate accommodations: unrestricted sitting, fine manipulation, and simple and firm grasping, but standing and walking of only up to four hours per day, lifting only 20 pounds, and stooping, kneeling, crouching, and crawling occasionally. (A.R. at 2590–91.) The form asks Dr. Ashlock to respond to the opinions of Drs. Allie and Mobarek and asks him to "provide a detailed explanation and point to the specific documentation in support of your opinion." (A.R. 2592–93.) The form asks that, if he disagrees with Spry's treating physicians, he "provide a detailed explanation of why your opinion differs[.]" (*Id.*) He wrote, in full, in response to both doctors:

> I respectfully disagree that the claimant is not able to work full-time. However, I agree with some recommendations of physical restrictions and limitations. The claimant requires restrictions to accommodate ongoing symptoms detailed above. The claimant can sit, stand, and walk at least 8 hours per day. She does retain the capacity of full-time gainful work within the recommended restrictions above.

(*Id.*) After consultation with Dr. Chou, Dr. Ashlock slightly modified his suggested restrictions— for example, decreasing the lifting limit to 10 pounds and his recommended standing and walking limit to 2 hours per day. (*Id.* at 2593–94.)

Prudential upheld its denial in an August 2023 letter. (*Id.* at 2738–45.) The Letter recounts the claims process leading to the Second Appeal and Dr. Chou's and Dr. Ashlock's file reviews. The Letter notes Dr. Ashlock's summary of Spry's many symptoms, his conclusion that "[m]ost diagnostic tests and objective findings have been normal," and his opinion that Spry can perform her full-time job with minor accommodations. (*Id.* at 2739–40.) It summarizes Dr. Chou's conclusion that "there are no measurable findings to support the severity of restrictions and limitations opined by these physicians." (*Id.* at 2740.) It summarizes the opinions of its vocational experts, who agreed that Spry was not disabled under the Plan. (*Id.* at 2740–41.) In addition, the Letter states that, because Spry's file did not "include documentation of cognitive testing or psychological testing to support functional impairment," nor 'evidence of ongoing care of a mental

21

health provider," the file therefore contained "no documentation to support the impact [Spry's mental health symptoms and cognitive impairment] may have on Ms. Spry's functional capacity." (*Id.*) The Letter concludes that, having considered the information in the file and the opinions of Spry's treating physicians, she can continue full-time work with the minor restrictions its reviewing physicians and vocational experts recommended. (*Id.* at 2741.) This lawsuit followed.

## IV.    DISCUSSION

To determine whether Prudential's denial of Spry's claim was an abuse of discretion, the court assesses its decision's procedural and substantive reasonableness. *Goodwin*, 137 F.4th at 589 (citing *Autran*, 27 F.4th at 411). Because the court finds Prudential's decision procedurally unreasonable, it does not address its substantive reasonableness.

### A.    Procedural Reasonableness

For Prudential's decision to have been procedurally reasonable, Prudential "must have engaged 'in reasoned decisionmaking.'" *Id.* (quoting *Autran*, 27 F.4th at 412). The court weighs whether: "(1) the administrator considered all relevant evidence; (2) the administrator adequately explained any change from an earlier benefits ruling; (3) the administrator prized the opinions of file reviewers over those who assessed the patient in-person; and (4) the administrator suffered from a conflict of interest."[24] *Id.* No one factor is dispositive. *Autran*, 27 F.4th at 412 (citations omitted).

#### 1.    Considered all relevant evidence

Spry contends that Prudential did not, as a general matter, consider all the relevant evidence, and specifically, that Prudential "fail[ed] to address Ms. Spry's confirmed cognitive

---

[24] The second factor is inapplicable because Prudential never changed Spry's benefits determination.

deficits in any meaningful way[.]" (Doc. No. 35 at 25; *see also id.* at 30 (arguing that Prudential's reviewing physicians' reports "ignore Ms. Spry's physicians' findings about her cognitive limitations").) Other than medical records related to her cognitive abilities, which the court will discuss, Spry does not identify records or evidence that Prudential declined to consider. For example, Spry does not contend that Prudential withheld medical records from its reviewing physicians. *Contrast Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (finding the administrator's decision arbitrary and capricious because it selectively sent vocational consultant reports and parts of the plaintiff's file "in hopes of obtaining a favorable report from the vocational consultant as to Spangler's ability to work"), *with Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311 (6th Cir. 2010) ("This is not a situation, as in *Spangler,* where the plan administrator picked one aberrant medical evaluation from the administrative record and provided it to a 'neutral' reviewer for evaluation.").

As the court recounted above, Prudential relied on the opinions of four reviewing physicians who examined voluminous medical records and the opinions of Spry's treating physicians, as well as the opinions of three vocational specialists. The reviewing physicians summarized at length Spry's symptoms, tests, and diagnoses. *Accord Goodwin*, 137 F.4th at 590 (finding that the insurance company considered all relevant evidence where its reviewing physicians "noted the reports of Goodwin's irregular heart rates, exercise stress test results, POTS diagnosis, shortness of breath issues, and cognitive impairment").) Whether Prudential adequately weighed the evidence it reviewed is a question the court will consider separately.

Spry argues, however, that Prudential wholesale ignored her doctors' reports of her cognitive impairments. (Doc. No. 35 at 29–30; Doc. No. 40 at 8–10; Doc. No. 39 at 14, 17–19 ("Prudential failed to address Ms. Spry's cognitive deficits in any meaningful way, focusing

23

instead on her physical abilities alone.").) The court puts to the side whether Prudential had substantial evidence for finding that any cognitive deficits Spry has did not support a finding of disability. Rather, the court addresses whether Prudential considered all relevant evidence that Spry submitted regarding her cognitive deficits.

As described above, Dr. Allie provided his opinion to Prudential regarding Spry's cognitive difficulties. (*See, e.g.*, A.R. at 0123 ("inability to concentrate and focus"); *id.* at 0124 (noting that Spry is unable to "articulate complex thoughts and express those thoughts verbally or in required writing"); *see also id.* 1968–69, 1995–97.) Dr. Mobarek also noted "brain fog" among Spry's symptoms. (*Id.* at 1367.) Prudential responds that it did consider Spry's cognitive defects, but that it properly discounted the opinions Spry's doctors belatedly supplied on forms during her appeal— in part through checkmarks noting vague cognitive problems—because the medical records contain scant evidence of cognitive limitations. (Doc. No. 38 at 14–17.) Moreover, Prudential argues, its reviewing physicians did *review* neurology records Spry submitted. (*Id.* at 15–16.) The court finds that the reviewing physicians did consider Spry's reported cognitive impairments.[25]

In addition, Dr. Ashlock summarized several opinion forms that Spry's treating physicians submitted. Dr. Ashlock noted Dr. Allie's recommendation, on a September 11, 2020 form, that,

---

[25] *See* A.R. at 1225 (Dr. Sims noting that, while the record does not support that cardiovascular disease has caused, among other symptoms, fatigue or impaired concentration, he recommended that a "physician of the appropriate specialty" assess those symptoms); *id.* at 2176 (Dr. Chou noting Dr. Mobarek's March 7, 2021 appointment, in which Spry reported brain fog); *id.* at 2565 (Dr. Chou noting Dr. Mobarek's February 22, 2022 appointment, in which Spry reports "recurrent episodes of . . . poor memory and brain fog"); *id.* at 2579 (Dr. Ashlock recounting Spry's report of "brain fog" in a February 19, 2020 appointment); *id.* at 2583 (Dr. Ashlock summarizing a May 13, 2021 appointment with Dr. Miyasato in which Spry noted that "her brain feels very foggy and cloudy," and that she "does not have the cognitive ability to do her prior job"); *id.* at 2586 (Dr. Ashlock summarizing a February 22, 2022 appointment with Dr. Mobarek, in which Spry reports "recurrent episodes of . . . poor memory [] and brain fog"); *id.* at 2588–89 (Dr. Ashlock summarizing Spry's condition as including brain fog and cloudiness, and "some slowed processing speed, and she is unable to [ ] do mental activities that she did prior to 1 year ago").

24

"[d]ue to the degree of physical *and mental impairment*, [Spry] was recommended not to return to work at this time." (*Id.* at 2580 (emphasis added).) Dr. Ashlock noted Dr. Allie's June 8, 2021 opinion that Spry's "medical condition would cause lapses in concentration or memory on a regular basis to the extent that she cannot attend to a task or be reliable in following work instructions." (*Id.* at 2585.) Dr. Ashlock noted the assessment by Wallace Stanfill, summarizing his review, in relevant part, as follows: "[b]oth the physical and cognitive symptoms described by Dr. Allie prevent[] any employment, let alone the cognitively demanding and complex duties of the claimant's job as Director of IT Audit and Compliance." (*Id.*) Dr. Ashlock noted Dr. Mobarek's November 9, 2021 opinion that Spry suffers from brain fog and that her condition "cause[s] lapses in concentration or memory on a regular basis to the extent that she cannot attend to a task or be reliable in following work instructions." (*Id.*)

And, as Prudential argues, the reviewing physicians discuss, at least to an extent, Spry's neurology records. For example, Dr. Massachi summarizes a February 11, 2021 neurology appointment with Dr. Kellum and Nurse Practitioner Dana Carter, (*id.* at 2166), although he omits the notes from that appointment according to which Spry reported "slowed processing speed" and the inability "to do mental activities that she did prior to 1 year ago." (*Id.* at 1882.) Dr. Ashlock, by contrast, does include Spry's reports of cognitive impairment in his summary of Spry's neurology appointment. (*Id.* at 2581 ("She has some slowed processing speed, and she is unable to [ ] do mental activities that she did prior to 1 year ago.").) As Prudential argues, (Doc. No. 38 at 16 n.12), during that neurology appointment Spry was "[a]ssess[ed]" as having six conditions— POTS, facial numbness, occipital neuralgia, a history of deep vein thrombosis, sleep disturbance, and neck pain—but no cognitive defects. (A.R. at 1886.)

While Prudential may not have agreed with the conclusions Spry's treating physicians reached regarding her cognitive function, the record does not support Spry's contention that Prudential did not consider all relevant evidence—including evidence Spry submitted regarding her cognitive function. Therefore, this element does not support Spry's argument that Prudential was procedurally unreasonable in evaluating her claim.

### 2. *Conflict of interest*

A conflict of interest exists when the plan administrator has the "dual role" to both determine a plan participant's eligibility for benefits and pay for them. *Glenn*, 554 U.S. at 108. That is the case here. (Answer ¶ 10.) The court will therefore consider Prudential's dual role as a factor in determining whether Prudential's decision was procedurally reasonable. As the Supreme Court explained, the administrator's "fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Glenn*, 544 U.S. at 112.

However, a conflict of interest does not change the standard of review or impose special procedural or evidentiary rules. *Id.* at 115–16. Instead, "conflicts are but one factor among many that a reviewing judge must take into account." *Id.* at 116–17. The existence of a conflict, therefore, is not dispositive. *Autran*, 27 F.4th at 412. And where the conflict is based only on the administrator's dual role, "'conclusory allegations of bias' based on this (relatively common) inherent conflict do not deserve much weight." *Id.* at 418 (quoting *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 664 (6th Cir. 2013)).[26] Courts give more weight to the conflict "in circumstances that suggest a higher likelihood that it affected the benefits decision." *Rothe*, 688 F. App'x at 319

---

[26] The Supreme Court has also noted that the "conflict question is less clear where," as in this case, "the plan administrator is not the employer itself but rather a professional insurance company." *Glenn*, 554 U.S. at 112.

(citing *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009)). For the conflict to be weighty in the court's analysis, the plaintiff should show that the "conflict materialized in a concrete way to influence the administrator's decisional process." *Autran*, 27 F.4th at 418 (citations omitted).

First, the plaintiff points out that an administrator who both determines benefits and pays for them would be reluctant to award benefits. (Doc. No. 39 at 5 (citing, generally, *Glenn*, 549 U.S.).) But while the existence of a conflict of this sort is probative, as discussed above, it alone is not weighty. The plaintiff next turns to circumstances that suggest that the conflict materialized, pointing to two of the reviewing doctors upon whose opinion Prudential relied. Specifically, the plaintiff states, the conflict of interest should weigh heavily in the court's analysis "because Prudential relied on consulting physicians who have a history of being retained by insurance companies in disability cases and have track records of finding claims unsupported." (Doc. No. 35 at 21.)

> a)   Dr. Chou

The plaintiff writes, "at least five times, Dr. Chou's opinions have been criticized and found unreliable." (Doc. No. 35 at 21–22 (first citing *McBriarty v. The Hartford*, No. 3:07-cv-128, 2008 WL 1995083, at *7 (W.D. Ky. May 6, 2008); then citing *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 841 (8th Cir. 2006) (Bye, J., dissenting); then citing *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003); then citing *Burris v. Aurora Health Care Long Term Disability Plan*, No. 08-cv-322, 2010 WL 11643436, at *8 (E.D. Wis. Mar. 18, 2010); and then citing *Shields v. Matrix Absence Mgmt., Inc.*, No. 06-cv-1314, 2008 WL 4443118, at *9 (E.D. Wis. Sept. 24, 2008)).

The cases Spry cites do not support her contention. As Prudential notes, the Dr. Chous in *McBriarty*, *Pratlutsky*, and *Hawkins* are not Dr. Stanley Chou, the cardiovascular specialist who

27

reviewed Spry's file, (A.R. at 2173, 2181), but other doctors who happen to share a surname. (Doc. No. 38 at 4–5.) *McBriarty* does not state its Dr. Chou's first name, and the opinion gives no indication that the Dr. Chou there is the Dr. Chou here, such that a prudent attorney would infer as much and cite the case as if it did, without qualification and without, apparently, looking at the docket. In fact, the record shows that the Dr. Chou in *McBriarty* is Dr. *Rodney* Chou. *See* Social Security Administration Office of Hearings and Appeals Decision at 2, *McBriarty v. The Hartford*, No. 3:07-cv-128 (W.D. Ky. Mar. 9, 2007), ECF No. 1-3 at 19. In *Pratlutsky*, the court discusses "physician consultant, *Chih–Hao Chou*, M.D., *Ph.D.*" who is "a board-certified physician in Internal Medicine and *Rheumatology*[.]" 435 F.3d at 836 (emphasis added). *Hawkins* also discusses a "Dr. Chih-Hao Chou." 326 F.3d at 916. Meanwhile, *Burris* and *Shields* do not criticize or find unreliable the opinion of Dr. Stanley Chou or any Dr. Chou; instead, both analogize to *Hawkins'* discussion of Dr. Chih-Hao Chou. *Compare Burris*, 2010 WL 11643436, at *8 ("These assertions are very similar to the assertions made by Dr. Chou in *Hawkins*[.]"), *with Shields*, 2008 WL 4443118, at *9 ("Dr. Ladin's report and conclusion are reminiscent of Dr. Chou's report in *Hawkins*."). The plaintiff did not respond in her Reply brief to the defendant on this point. Therefore, no conflict of interest arises from Dr. Stanley Chou's review of Spry's file. And, to be clear, no case the parties cite calls into question Dr. Stanley Chou's competency or professionalism.[27]

> b) *Dr. Ashlock*

The plaintiff next calls into question Dr. Ashlock's review of her file. Spry states, "insurance companies have unreasonably relied on Dr. Ashlock to deny claims." (Doc. No. 35 at

---

[27] The court will attribute the foregoing to carelessness, rather than deceit. Regardless, the plaintiff's counsel are reminded of their duty of candor to this court and to opposing counsel, and of their duty to ensure that cases stand for the propositions for which they are cited.

22 (citing *McCulloch v. Hartford Life & Accident Ins. Co.*, No. 19-cv-07716-SI, 2020 WL 7711257, at \*10 (N.D. Cal. Dec. 29, 2020).) In *McCulloch*, the court was "unpersuaded by Dr. Ashlock's report" because he "disregarded the results of the CPET [cardiopulmonary exercise test] as an 'isolated and unexplained source of investigation into [plaintiff's] reports of air hunger and fatigue' without explaining why the CPET was isolated or how Dr. Snell's report of the CPET findings were unexplained." *McCulloch*, 2020 WL 7711257, at \*10 (second alteration in original). The parties debate *McCulloch*'s precise findings and their significance. (*Contrast* Doc. No. 38 at 5 n.1 ("That Court was 'unpersuaded' by Dr. Ashlock's report in a matter under *de novo* review, but did not find he 'unreasonably' disregarded evidence as alleged by Plaintiff, and did not find his review supported a 'heavy weighing' of the conflict of interest."), *with* Doc. No. 40 at 4–5 ("[T]his case shows that Dr. Ashlock has been guilty of issuing unreasonable opinions in favor of denying claims.").) While *McCulloch* found that Dr. Ashlock disregarded a medical test he ought not have, this mistake alone does not weigh heavily in the court's conflict of interest analysis, both because Spry presents only one such instance and because Prudential's decision incorporated the similar opinions of three other reviewing physicians whose involvement in this case provides no evidence of a conflict. *Cf. Autran*, 27 F.4th at 418 (giving, as examples of materialization of a conflict of interest, the production of internal emails showing bias or "*repeated* reliance on a *suspect doctor* with a *history* of questionable medical opinions." (emphasis added) (citing *Holden*, 2021 WL 2836624, at \*17 n.21)).

Spry further argues that Dr. Ashlock's clarification, at Prudential's request, of his seemingly contradictory recommendations on contemporaneously submitted forms, in which Spry contends that he recommended slightly less favorable accommodations, is evidence of a conflict of interest. (Doc. No. 35 at 22, 32; Doc. No. 40 at 5–7.) The court will not describe the complicated

circumstances and poorly drafted forms that led to the purported discrepancy. But the court is not persuaded that Dr. Ashlock's clarification "supports the fact that his conflict of interest influenced his reports and that Defendant's ultimate reliance on his opinion was arbitrary and capricious." (Doc. No. 40 at 7.)

A conflict of interest arises only from Prudential's financial incentive not to pay benefits, which weighs only slightly in favor of procedural unreasonableness.

### 3. *Deference to file reviewers over treating physicians*

ERISA does not require that plan administrators accord "special deference" to the opinions of a claimant's treating physician, and it does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). So, the mere fact that an insurance company finds the opinions of its own reviewing physicians more persuasive than those of the claimant's does not make its denial unreasonable. *Goodwin*, 137 F.4th at 591. Rather, "[r]eliance on [non-treating] physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions." *Harmon*, 2024 WL 1075068, at *2 (quoting *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010) (alterations in *Harmon*)).

At the same time, however, while there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Avery*, 2023 WL 4703865, at *9 (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005)), the court must include as a factor in its analysis whether the "credited doctors undert[ook] a mere 'file' review or conduct[ed] a thorough in-person evaluation." *Autran*, 27 F.4th at 412. It is undisputed that none of the doctors whose opinions Prudential relied upon conducted an in-person evaluation, even though the Plan permitted it. (Doc. No. 38 at 17, 19; A.R. at 2835 ("We can require examinations as often as it is reasonable to do so.").) Thus, the "failure to conduct a physical

30

examination, where the Plan document gave the plan administrator the right to do so, 'raise[s] questions about the thoroughness and accuracy of the benefits determination.'" *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015) (quoting *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (alteration in *Shaw*)).

In addition, "[t]he failure to conduct an examination . . . is especially problematic when the plan administrator makes the determination to deny benefits based on an assessment of the credibility of the claimant." *Holden*, 2021 WL 2836624, at *13 (citing *Helfman*, 573 F.3d at 395–96); *see also Guest-Marcotte v. Life Ins. Co. of N. Am.*, 730 F. App'x 292, 302 (6th Cir. 2018) ("[W]e have repeatedly cautioned that plan administrators should not make 'credibility determinations concerning the patient's subjective complaints without the benefit of a physical examination.'" (quoting *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006))).

The parties dispute whether Prudential's reviewing physicians made credibility determinations at all, and whether Prudential appropriately discounted the opinions of Spry's treating physicians, as Prudential argues. (Doc. No. 38 at 12 ("The reviewing physicians had sufficient basis to discount Dr. Allie's and Dr. Mobarek's provided restrictions." (capitalizations removed)).) In any event, Prudential's decision not to have a doctor or other professional evaluate Spry, during any of its three reviews of Spry's file, raises questions about its thoroughness and accuracy. *Accord Shaw*, 795 F.3d at 550.

In this case, the record shows either that Prudential did not accept Spry's symptoms or their severity, which would constitute an improper credibility determination without an in-person examination, or it ignored the recommendations of Spry's treating physicians without explanation. *Accord Holden*, 2021 WL 2836624, at *12 ("[P]lan administrators cannot outright *ignore* a treating physician's competing conclusion or refuse to even explain the reason for its rejection of the

treating physician's conclusion . . . . We have noted that 'the failure of . . . independent-review physicians . . . to explain why they [have] disregarded the opinions of treating doctors was arbitrary.'" (quoting *Cooper v. Life Ins. Co. of. N. Am.*, 486 F.3d 157, 170 (6th Cir. 2007) (emphasis in original))) (citation modified); *accord Liggett v. Principal Fin. Grp.*, No. 22-cv-11183, 2025 WL 275119, at *5 (E.D. Mich. Jan. 23, 2025) ("Principal Life instead credited the opinion of a non-treating physician who never examined Liggett and did not seriously engage with Liggett's treating physician's contrary conclusions."), *appeal dismissed sub nom. Liggett v. Principal Life Ins. Co.*, No. 25-1168, 2025 WL 1492356 (6th Cir. Apr. 11, 2025).

Spry argues that Prudential "relied on its file-reviewers' determinations that Ms. Spry's consistently reported symptoms were not credible or supported by her medical records." (Doc. No. 35 at 27; *see also id.* at 25 (referring to Prudential's "improper credibility determinations as to the severity of Ms. Spry's pain and other symptoms").) Prudential responds that it made no credibility determinations: "all of the reviewers *believed* Plaintiff's assertions of suffering the symptoms of POTS *contained in the medical records*[.]" (Doc. No. 38 at 17 (emphasis in original).) Moreover, Prudential argues that Spry's treating physicians "fail[ed] to support their positions with medical findings," that their "opinions simply are not credible or compelling," and that therefore "it was entirely reasonable and proper for Prudential to discredit their opinions" and deny Spry's claim. (Doc. No. 37 at 2; *see also id.* at 18 ("the opinions of Drs. Allie and Mobarek . . . lacked reliable supporting evidence . . . [and] are due no special weight").)

Prudential is right that it need not accord special weight to the opinion of a treating physician "if it is not supported by the medical records." *Hall v. United of Omaha Life Ins. Co.*, No. 1:14-cv-08, 2015 WL 3867740, at *8 (W.D. Mich. June 23, 2015). But the medical records, separate and apart from the opinions of Spry's treating physicians provided during the claims

process, contain extensive evidence of the POTS symptoms her treating physicians explain make her disabled.[28] Prudential concedes that Spry has POTS. (Doc. No. 37 at 1.) But while the reviewing physicians summarize her treating physicians' reports, including the symptoms and diagnoses contained therein, it appears that neither they, nor Prudential, found Spry's medical reports credible, despite Prudential's statements to the contrary in briefing.

---

[28] *See, e.g.*, A.R. at 0768–69, Nov. 21, 2019 appointment with Dr. Allie (reporting shortness of breath and headache, tingling on her scalp, face, lips, and arms); *id.* at 745, Nov. 25, 2019 appointment with Dr. Allie (reporting chest pain and racing heart); *id.* at 670–71, Feb. 21, 2020 appointment with Dr. Allie (reporting "fatigue . . . likely POTS, weakness" and "malaise, fatigue, generalized pain, lethargy and sudden exhaustion"); *id.* at 1083–4, 86, (Jan. 28, 2020 appointment at the Mayo Clinic indicating that Spry "presents with concerns about repetitive spells," which "primarily consist of tachycardia and hypertension with associated perspiration and pale color with patient feeling wiped out after such episodes;" that Spry "is sometimes having headaches before/during or after the episodes;" that Spry "states [that] the episodes occur multiple times per day and typically last less than 10 minutes;" that Spry "notes predisposition towards tachycardia with even minimal activity such as washing dishes;" and finding Spry "[p]ositive for" fatigue, dyspnea, chest pain, pressure or tightness and rapid or fluttering heart beat, abdominal pain or cramping, constipation and nausea, light-headedness, numbness or shooting pain in hands, arms, legs, or feet, excessive daytime sleepiness, and headaches); *id.* at 0979, (Feb. 3, 2020 Mayo Clinic appointment noting that Spry was positive for fatigue, dyspnea, chest pain, pressure or tightness and rapid or fluttering heartbeat, abdominal pain or cramping, constipation and nausea, light-headedness, numbness or shooting pain in hands, arms, legs, or feet, excessive daytime sleepiness and headaches, dyspnea, chest pain, pressure or tightness, and rapid or fluttering heart beat); *id.* at 1882 (neurology consult with Dr. Jesse Kellum and Dana Carter noting daily headaches in the back of the head aggravated by "standing or being active for over 1 hour" and "[a]lleviating factors" of rest and lying down; and noting that Spry "[s]ometimes gets right eye pulling sensation and eye pain," that she experiences nausea, photophobia, tingling in her face, tongue, and lips, trouble sleeping and waking up gasping, "slow processing speed," that she is "unable to do mental activities that she did prior to 1 year ago," and generalized weakness when she is active for too long); *id.* at 1982 (Mar. 8, 2021 appointment with Dr. Mobarek noting that Spry reported "lightheadedness upon standing, photosensitivity, sound sensitivity, palpitations, chest pain, severe fatigue, exercise intolerance, heat intolerance, excessive sweating, muscle twitches, tremors, brain fog, hoarseness of voice, ringing in the ears, . . . polydipsia . . . severe headaches located in the back of the head, occurring daily[,] and tingling and numbness in lower extremities," in addition to "moderate to severe pain all over, balance issues," "nausea, diarrhea, constipation, abdominal cramping, difficulty swallowing," and "difficulty falling asleep and frequently waking up in the middle of the night from racing palpitations.").

33

Prudential may have reasonably discounted some of Spry's treating physicians' medical opinions. For example, Prudential argues at length that, while Spry was diagnosed with fibromyalgia in 2017, neither she nor her treating physicians described it as an impairing condition on any of several forms and that it is nearly absent from any medical records until plaintiff's counsel asked Dr. Allie about Spry's fibromyalgia while taking a sworn statement in June 2021, a year and a half after Spry's proposed January 2020 date of disability. (Doc. No. 37 at 21–22.) Spry does not respond to this argument.

And while the plaintiff argues that Prudential's reviewing physicians did not "weigh Ms. Spry's documented cognitive deficits" and that they "failed to meaningfully grapple with or discuss the  information and opinions provided by Ms. Spry's treating physicians about her cognitive defects," (Doc. No. 35 at 27–28), Spry does not respond to Prudential's argument on this point. Prudential argues that, while Dr. Allie opines in a sworn conversation with plaintiff's counsel and by checkmarks on counsel-provided forms that Spry has cognitive impairments that prevent her from working, these are not supported by the medical records Spry submitted and should be ignored. (Doc. No. 37 at 23.) As the court has discussed above, the opinions that Dr. Allie gives, through checkmarks, indicate a wide array of specific cognitive defects, the basis for which is not quite clear from the record, and they remain underexplained by Dr. Allie. For example, Dr. Allie indicates that Spry has a poor ability to "deal with the public," and "demonstrate reliability." (A.R. at 1353.) While that may be true, he does not explain, based on the medical records, why that is the case or how he came to that opinion. Moreover, as the defendant points out, there are no psychological records to support such limitations.

Putting the foregoing aside, however, Prudential unreasonably ignored, without explanation, the opinions of Spry's treating physicians without conducting its own evaluation of

her. *Cf. Wooden v. Alcoa, Inc.*, 511 F. App'x 477, 484 (6th Cir. 2013) (noting that "file reviewers did not ignore Dr. Riethmiller's analysis [because they] explained why his diagnosis was questionable").

Spry submitted the Statement of her attending physician, Dr. Allie, according to whom she had "severe and relentless fatigue, muscle pain and weakness, unmanaged rapid heart rate and tachycardia with and without exertion, shortness of breath, nausea, night sweats, heat intolerance, anxiety-like symptoms, dizziness and lightheadedness, poor tolerance to stress, blurry vision and sometimes double vision, headaches including migraines, tremulousness throughout [her] body, palpitations, daytime sleepiness, inability to concentrate and focus, non-refreshing/restorative sleep, post-exertional fatigue, and medication side-effects." (A.R. at 0123.)

Prudential's first reviewing physician, Dr. Sims, "assessed the [file of the] claimant from [a] strictly cardiovascular standpoint" and found "no evidence of significant structural heart disease that would cause fatigue, muscle pain, weakness, shortness of breath, nausea, heat intolerance[,] anxiety, [or] impaired concentration," and therefore "defer[red] assessment of these symptoms to a physician of the appropriate specialty." (*Id.* at 1225.) Prudential, in turn, in its First Denial Letter, wrote, "Dr. Sims noted that there was no evidence of any significant structural heart disease that would cause your reported fatigue, muscle pain, weakness, shortness of breath, nausea, heat intolerance, anxiety or impaired concentration." (*Id.* at 1263.) A literal reading of Prudential's statement is that Spry's symptoms, if any, are not caused by significant structural heart disease. But the Plan does not require that heart disease cause a claimant's disability. A better interpretation of Prudential's statement, therefore, is that Spry does not have the symptoms her doctors describe.

In her First Appeal, Spry submitted Dr. Allie's Sworn Statement, in which he described Spry as "virtually debilitated" and stated that, "if she exerts herself even in the slightest of task . .

35

. she is thus rendered with extreme exhaustion, extreme fatigue, malaise, tachycardia, hypertension, headache, paresthesias." (*Id.* at 1357, 1359.) Dr. Mobarek, Spry's other treating physician, indicated that Spry suffered from "daily chronic tachycardia causing syncope, dyspnea, palpitations, confusion, lightheaded[ness], dizz[iness], severe fatigue, exercise intolerance, heat intolerance, brain fog, nausea, diarrhea, constipation and abdominal cramping," and "[c]onstant moderate to severe generalized pain." (*Id.* at 1367.) He noted that she could sit for only one to two hours per day, fewer than five days per week, that she would have to lie down for six hours every day and take "very [f]requent breaks of at least 30 minutes," and, that she would be absent from work roughly 8–10 days per month. (*Id.* at 1367–69.)

Drs. Massachi and Chou, who reviewed Spry's file during her First Appeal, acknowledged that Spry has POTS, which Dr. Massachi noted caused "symptoms of palpitations, headaches, dizziness[,] and excessive sweating." (*Id.* at 2169.) However, Dr. Massachi concluded that, "[w]ith regards to her POTS, she is recommended lifestyle modification with aerobic exercises and staying more active to improve her symptoms. Therefore, the claimant requires no restrictions and limitations." (*Id.*) Moreover, as Prudential reiterates, Dr. Massachi noted that Spry was told that her symptoms were "not life threatening" and that she was advised to exercise. (Doc. No. 38 at 13 (quoting A.R. at 2170).) The court agrees with the plaintiff that neither Dr. Massachi nor Prudential explains why it is relevant to a disability determination that Spry's symptoms were not life-threatening or that they may improve with exercise. (Doc. No. 40 at 15.)[29]

---

[29] And in any case, Dr. Mobarek noted, in a February 2022 appointment, that Spry "was doing poorly from the cardiac standpoint *though she has been compliant* with her medical regimen," which included "daily aerobic exercises[.]" (A.R. at 2458 (emphasis added).) At an appointment a year before, Dr. Mobarek noted that Spry exercised two hours per week even though it exacerbated her symptoms. (Mar. 8, 2021 appointment, A.R. at 1982.)

36

Importantly, while Prudential states that Drs. Massachi and Chou "carefully analyzed the opinions of Plaintiff's treating physicians and articulated detailed reasoning of [sic] the medical evidence did not support those opinions," (Doc. No. 37 at 14 (citing A.R. at 2170, 2178)), neither doctor's Report includes what the court finds to be careful analysis or detailed reasoning. For example, the doctors were asked to respond to Dr. Allie's opinion regarding Spry's "functional capacity including . . . behavioral/cognitive functional activities." (A.R. at 2170.) Dr. Massachi agreed that Spry has some symptoms, but wrote that she does not require "any restrictions or limitations." (*Id.*) As for detailed reasoning, he wrote only that "the nature/level of impairment endorsed by Dr. Allie is not reasonably consistent with and/or supported by the medical documentation in the file." (*Id.*) And, as described above, Dr. Massachi opined that no limitations were required because Spry's condition is not life-threatening and she had been encouraged to exercise to alleviate symptoms. (*Id.*)

As the court discussed above, Dr. Chou acknowledged, for example, that in an appointment with Dr. Mobarek, Spry reported "lightheadedness upon standing, photosensitivity; sound sensitivity, palpitations; chest pain; severe fatigue; exercise intolerance; heat intolerance, excessive sweating, muscle twitches, tremors, brain fog, hoarseness of voice; ringing in the ears; and polydipsia[.]" (*Id.* at 2176.) Dr. Chou noted Spry's appointment with Dr. Miyasoto, who noted both overall improvement, but also that, on some days, Spry was "unable to do any activity because of severe dizziness and coat h[a]nger headaches." (A.R. at 2167.) Dr. Chou was asked to respond to the medical opinions of both Drs. Allie and Mobarek, in response to both of which, in full, Dr. Chou stated, "I respectfully disagree with the outlined restrictions, except for the lifting restriction, as there are no measurable findings to support such strict restrictions for the claimant." (*Id.* at 2178.) Echoing Dr. Chou's opinion, Prudential wrote, in its First Appeal Denial Letter, that "the

level of impairment opined by Dr. Mobarek[] and Dr. Allie are not supported by the information in [the] file and citing [sic] a lack of measurable findings that would support such strict restrictions." (*Id.* at 2251.) Prudential added that the impairments Spry's doctors described were not "supported by the information on file, including the results of diagnostic and laboratory testing, findings on physical examinations and clinical observations documented in treatment notes." (*Id.* at 2252.) The very forms that Prudential's reviewing physicians filled out asked them to provide detailed analysis with specific references to the record. They did not.

Prudential rightly points out that it owed Spry's treating physicians no special deference and has no heightened burden of explanation when crediting its own doctors' opinions. But without having its own physician examine Spry during any of its three, months-long reviews, Prudential cannot set aside the opinions of Spry's treating physicians with conclusory statements. *See Shaw*, 795 F.3d at 548 ("[Plan administrators] 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.'" (quoting *Nord*, 538 U.S. at 834)); *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006) (noting that a plan administrator "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician") (citing *Nord*, 538 U.S. at 834), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

Moreover, even though Prudential acknowledges that the Plan does not require the claimant to provide "objective" evidence of disability, (Doc. No. 41 at 2), as some plans do, Prudential nevertheless states that Spry's file does not contain "objective evidence" of her disability. (Doc. No. 37 at 24 ("The July 21, 2021 report by Certified Rehabilitation Counselor Wallace Stanfill contained no objective evidence of Plaintiff's alleged disability." (citing A.R. at 2131–38)).) And Prudential describes Dr. Chou as rejecting the opinions of Spry's treating physicians as "unsupported by the medical record" because, according to Dr. Chou, in two separate Reports,

"there are no *measurable findings* to support such strict restrictions for the claimant." (Doc. No. 38 at 12–13 (quoting A.R. at 2178, 2569) (emphasis added).) Furthermore, Prudential cites caselaw for the proposition that such evidence is required. (Doc. No. 37 at 16–17 (quoting *Filthaut v. AT&T Midwest Disability Benefit Plan*, 710 F. App'x 676, 685 (6th Cir. 2017) for the proposition that the plaintiff "bears the burden of proving her disability by producing objective medical evidence").) When plans do not require objective evidence, as in this case, the insurance company's denial based upon lack of objective evidence constitutes an abuse of discretion. *Accord Sisk v. Gannet Co.*, No. 3:11-cv-1159, 2014 WL 1575628, at *13 (M.D. Tenn. Apr. 21, 2014) (Brown, M.J.) (finding that the defendant's "requirement for objective medical evidence is a 'new requirement[] for coverage . . . added to those enumerated by the Plan,' which renders that denial arbitrary and capricious." (quoting *Burge v. Republic Engineered Prods.*, 432 Fed. Appx. 539, 550 (6th Cir. 2011))), *R. & R. adopted*, No. 3-11-1159, 2014 WL 3966456 (M.D. Tenn. Aug. 13, 2014) (Campbell, J.).

In response to Spry's Second Appeal, Dr. Chou reported notes from a February 2022 appointment with Dr. Mobarek indicating that Spry "has been doing poorly from the cardiac standpoint. She remains with recurrent episodes of dizziness, lightheadedness, nausea, racing palpitations, dyspnea, chest burning, fatigue, poor memory, and brain fog." (A.R. at 2567.) Dr. Chou again concluded, however, that "there are no measurable findings to support such strict restrictions for the claimant." (*Id.* at 2569.) That is, either (a) the foregoing are not measurable findings; or (b) an auditor can continue full-time work despite episodes of dizziness, lightheadedness, nausea, racing palpitations, dyspnea, chest burning, fatigue, poor memory, and brain fog, among her other symptoms described elsewhere; or (c) Spry is not actually suffering from the symptoms Dr. Mobarek reported. Dr. Chou does not explain his reasoning.

39

In his review during Spry's Second Appeal, Dr. Ashlock summarized many of Spry's symptoms: "tachycardia/palpitations, perspiration, paleness, tremors, headaches, chest tightness, dizziness, malaise/fatigue, orthostasis, weakness, dysphagia, abdominal discomfort, and brain fog." (*Id.* at 2588–89.) He further noted "paresthesia in her hands and pulsations in her legs and gum area," intermittent pain and stiffness in her feet, tingling in her face and tongue, face and throat numbness accompanied by throat-tightness, lip-twitching, "a sensation like something is wrapping around her right eye and pulling it back into her head," a "feel[ing] like she's being choked and like there is pressure/burning in her chest, preventing her from breathing properly," chronic fatigue, brain fog, daily headaches, occasional nausea and photophobia, intermittent dysphasia, and "periodic numbness and tingling and the feeling of ants crawling on her lower legs and feet." (*Id.* at 2589.) Dr. Ashlock concluded that Spry "is mainly impaired" due to POTS, which causes "fatigue, SOB/breathlessness, weakness, tachycardia/palpitations, chest tightness, profuse sweating, dizziness, lightheadedness, tremors gastrointestinal symptoms (abdominal discomfort), headaches, vision problems, numbness/tingling sensations that occur during episodes." (*Id..* at 2590.) Dr. Ashlock quoted treating physician Dr. Mobarek's November 2021 opinion as stating that Spry has "daily chronic tachycardia causing her syncope, dyspnea, palpitations, confusion, lightheadedness, dizziness, severe[] fatigue[], exercise intolerance, heat intolerance, brain fog, nausea, diarrhea, constipation, and abdominal cramping. She has constant moderate to severe generalized pain." (*Id.* at 2593.) While Dr. Ashlock disagreed with Dr. Mobarek's determination that Spry is not able to work, he wrote that Spry "requires restrictions to accommodate ongoing symptoms detailed above." (*Id.*) After consultation with Dr. Chou, Dr. Ashlock stated:

> Although most diagnostic tests and objective findings were normal, the claimant continued to have subjective symptoms which are variable and unpredictable in nature; thus, the claimant requires precautions as she remains at significant risk of injury.

(*Id.*) Thus, while Dr. Ashlock appears to have acknowledged Spry's reported symptoms, his suggested recommendations of limited standing with breaks imply that he does not believe them.

Prudential relied, in part, on Dr. Ashlock's review in upholding its denial of Spry's claim. (Doc. No. 37 at 9, 13.) In its denial of Spry's Second Appeal, Prudential quoted at length from Dr. Ashlock's summary of Spry's symptoms, reproduced above. (A.R. at 2739–40.) Spry argues that "Dr. Ashlock did not state his reason for disagreeing with the level of restrictions and limitations given by Ms. Spry's treating physicians." (Doc. No. 35 at 27–28 (citing A.R. at 2574–96).) Prudential responds that "Dr. Ashlock's report contains a detailed explanation of Plaintiff's restrictions and limitations and why he did not support the restrictions and limitations Drs. Allie and Mobarek prescribed." (Doc. No. 38 at 13–14 (citing A.R. at 2588–91).) In a similar vein, Prudential states that "Dr. Ashlock . . . carefully analyzed the opinions of Plaintiff's treating physicians and explained in detail why the medical evidence did not support those opinions." (Doc. No. 37 at 15 (citing A.R. at 2592-93); *see also* (Doc. No. 37 at 8 ("Dr. Ashlock also considered the opinions of Plaintiff's treating physicians Drs. Allie and Mobarek, but disagreed with them because they were not supported by the medical record." (citing A.R. at 2592–93)).)

Prudential does not accurately represent Dr. Ashlock's Report, which simply does not engage with the opinions of Spry's treating physicians. As in the reports by Prudential's other file-reviewing physicians, the form refers to the opinions of Drs. Allie and Mobarek, respectively, and asks whether each is supported by the record. In consecutive questions, the form asks Dr. Ashlock to respond to each treating physician separately, and to "provide a *detailed* explanation and point to the *specific documentation* in support of your opinion. If you opine the level of impairment is not medically supported, *please provide a detailed explanation* of why your opinion differs[.]"

41

(A.R. at 2592–93.) In response to both questions, Dr. Ashlock first quotes each doctor's opinion describing Spry's limitations, and then writes, in full:

> I respectfully disagree that the claimant is not able to work full-time. However, I agree with some recommendations of physical restrictions and limitations. The claimant requires restrictions to accommodate ongoing symptoms detailed above. The claimant can sit, stand, and walk at least 8 hours per day. She does retain the capacity of full-time gainful work within the recommended restrictions above.

(A.R. at 2592–93.) Dr. Ashlock does not therein, or otherwise, explain why he disagrees with Spry's treating physicians. The foregoing cannot reasonably be characterized as detailed or careful analysis. Unquestionably, it does not cite the record.

Prudential argues that it properly discounted the views of Spry's treating physicians because they are not supported in the record, including that their opinions are not supported by tests or by clinical notes. Indeed, the First Appeal Denial Letter states that the reviewing physicians "did not find the level of impairment indicated by Ms. Spry's treating providers to be supported by the information on file, including the results of diagnostic and laboratory testing, findings on physical examinations and clinical observations documented in treatment notes." (A.R. at 2252.) As the court has recounted above, however, Spry's treatment notes are replete with evidence of her many symptoms, which informed the opinions of her treating physicians. While Prudential need not have accorded Spry's treating physicians any special deference, it cannot "cavalierly dismiss[] all evidence of the employee's disabling conditions." *Outward v. Eaton Corp. Disability Plan for U.S. Emps.*, 808 F. App'x 296, 317 (6th Cir. 2020).

*Outward* is a similar ERISA case, in which the court applied the arbitrary and capricious standard to review the denial of LTD benefits for a plaintiff whose treating physician reported that she suffered from "malaise and fatigue, tingling and numbness in her extremities, difficulty focusing, and . . . POTS." *Id.* at 300, 316, 319 (reversing the district court and remanding with instructions to return the case to the plan administrator for a full and fair review of the record). As

42

in this case, the court noted that the plaintiff "became . . . fatigued by minimal exertion" and the insurance company's file-reviewing doctors "recognized that [the plaintiff] exhibited multiple symptoms frequently seen in patients with POTS, that she suffered from extreme fatigability that cannot be verified by objective medical testing, and that she complained of 'dizziness and fatigue and vague sensations of numbness over the face and extremities.'" *Id.* at 318. Unlike Spry's Plan, the plan in *Outward* "require[d] a claimant to provide *objective* findings of a disability." *Id.* at 316 (emphasis in original). The court found that the record included "objective diagnoses and treatments [that] showed that any expectation that [the plaintiff] could perform any job without limitation or restriction was unprincipled, unreasoned, and contrary to the evidence in the record." *Id.* at 318. Outward had "presented voluminous evidence of her restrictions through the diagnoses from her treating physician, through the findings from physical exams, through doctors' observations of her diminished capacities, and through the medications and treatment plans prescribed for her." *Id.* at 316. "Of course," the court noted, "in order to make those diagnoses and prescribe medications and treatment plans, physicians had to rely in part upon the patient's own description of her condition, but such information is essential to providing proper medical care to any patient. Indeed, to ignore such proffered information would constitute medical malpractice." *Id.* The court found the administrator's denial arbitrary and capricious, in part, because it discounted the opinions of her treating physician, "concluding that the diagnoses of disabling conditions were not supported by what the Plan Administrator considered objective medical findings." *Id.* Similar to this case, the administrator "discounted evidence offered by Outward's treating physician and other professionals that provided a broader, more holistic, more complete picture of Outward's situation." *Id.* at 319.

Prudential has a conflict of interest; declined to examine Spry, even though the Plan permitted it; and relied on file-reviewing physicians who either made improper credibility determinations or ignored the opinions of Spry's treating physicians. Prudential's denial of Spry's claim was procedurally unreasonable and therefore constitutes an abuse of discretion.

### B.    Remedy

Because the court has found Prudential's decision constituted an abuse of discretion, the court will deny its Motion. Spry asks the court to reverse Prudential's denial of her claim and award her LTD benefits. "If the record leaves no doubt that an ERISA plan entitles a beneficiary to benefits, the court may simply award the 'benefits due to him under the terms of his plan[.]'"*Card v. Principal Life Ins. Co.*, 17 F.4th 620, 624 (6th Cir. 2021) (per curiam) (quoting 29 U.S.C. § 1132(a)(1)(B) (alteration in *Card*)). The court does not find, based on the plaintiff's briefs, which focused on the procedural reasonableness of Prudential's decision, that the Administrative record leaves no doubt that she is entitled to LTD benefits. And in any case, when the administrator has made a procedural error, as here, "a court should 'remand' the beneficiary's claims to the plan administrator for a second benefits determination." *Id.* at 624–25.

## V.    CONCLUSION

Under the "exceedingly deferential" standard of review in this case, the court is not tasked to determine whether Prudential's decision was the right one. *Eberle v. Am. Elec. Power Sys. Long-Term Disability Plan*, No. 21-4224, 2022 WL 5434559, at *1 (6th Cir. Oct. 7, 2022). However, because Prudential's file review was procedurally unreasonable, it "flunked even this deferential test." *Card*, 17 F.4th at 624. At the same time, however, the record does not show that Spry is clearly entitled to the benefits she seeks. Accordingly, the parties' Motions (Doc. Nos. 34, 36) will be denied, and the court will remand the case to Prudential for further proceedings consistent with this opinion.

44

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge